## MAYER v. MARKS.

No. 11245—Opinion Filed July 10, 1923.

**1. Breach of Marriage Promise—Damages —Excessiveness.**

Section 5995, Comp. Stats. 1921, provides that the damages for the breach of a promise of marriage rest in the sound discretion of the jury. Evidence in this case examined, and held, that there is nothing to sustain the contention that the verdict of the jury is excessive.

**2. Courts — Terms — Effect of Adjournment.**

This case was tried on the 4th day of March, 1919. The act of the Legislature of February 24, 1919, changed the time of holding court in Okmulgee county, making the terms commence the first Mondays in February, June, and October. A prior statute had fixed the terms to commence on the first Mondays in March, June, and November. It is contended that the court that tried this case on the 4th day of March, 1919, was not legally in session, and that is assigned as error. Section 3089, Comp. Stats. 1921, provides, among other things, that when a court is regularly convened, it shall continue until the same expires by law or is adjourned sine die. Record examined, and held, that there is nothing in the record to justify the contention that the court was not in session on the day of the trial of this cause.

(Syllabus by Maxey, C.)

Commissioners' Opinion, Division No. 1.

Error from District Court, Okmulgee County; Mark L. Bozarth, Judge.

Action by Minnie Marks against Shy Mayer for damages for breach of marriage promise. Judgment for plaintiff, and defendant brings error. Affirmed.

This is an action by Minnie Marks against Shy Mayer for a breach of a marriage contract, which it is alleged was consummated between the parties about the first day of July, 1917; the announcement of the engagement of the parties was sent out to their friends and relatives, and the fifth day of August was fixed as the date for their marriage. A couple of days before they were to marry, the defendant, Shy Mayer, was taken sick and removed to a hospital in the city of Muskogee, where an operation was performed on him for appendicitis. He was confined in the hospital for about 16 days. When he returned to his home in Okmulgee, and after his return home, he became morose and cold towards the plaintiff and refused to call on her and refused to fix another time for the marriage, and finally, on November 25th, he stated to her that he did not love her any more and had no respect for her, and that she could go where she pleased and do what she pleased. The next day this suit was brought, and on the fourth day of March, 1919, a trial was had to the court and a jury, which resulted in a verdict for the plaintiff for the sum of $5,000. A motion for new trial was filed and overruled, and the case duly appealed to this court. Affirmed.

G. E. Cassity and John Caruthers, for plaintiff in error.

Charles A. Dixon and E. M. Carter, for defendant in error.

Opinion by MAXEY, C. This is a very unusual case, in that both plaintiff and defendant are of the Jewish race. It is characteristic of the orthodox Jews that they are the most loyal and devoted race, one to the other, of any race of people. They are noted for their love and affection of wife and children, and a divorce among them is rarely heard of. They stand by each other when in trouble with a zeal that is truly commendable and worthy of emulation. It is inconceivable to us how the parties to this suit so far forget the traditions of their race as to have appeared in the courts of the country as plaintiff and defendant in a "breach of a marriage contract." Yet they are here in court asking that we pass judgment on their unfaithfulness.

It appears that the plaintiff was born and reared in the city of New York and came to Okmulgee, Okla., to visit her brother, whom she had not seen for several years,

about the first of June, 1917. She was then 27 years of age, and a few days after her arrival she met defendant, who was at that time about 34 years of age, and a prosperous merchant in Okmulgee and had been for several years prior thereto.

It appears to have been a case of "love at first sight as the defendant began calling on the plaintiff once or twice a day and kept this up until the first of July, when they became engaged and their engagement was announced by notices sent out to their relatives and friends, and the date for their marriage set for Aug. 5, 1917. There was much activity during the month of July, preparing for the coming event; a lot was purchased and carpenters employed to build a house thereon; furniture was contracted for to furnish the house when completed. The bride-to-be bought a trousseau and other paraphernalia that goes with a wedding outfit. A rabbi was engaged to come from the city of Tulsa and perform the marriage ceremony, and everything was progressing as nicely as could be desired, when, Oh, cruel fate! Shy got sick and the trouble began. He was taken to a hospital at Muskogee and underwent an operation for appendicitis, and was confined in the hospital for several days. When he returned to his home in Okmulgee from the hospital, his whole conduct toward the plaintiff changed. Instead of the ardent lover and devoted suitor that he had been, he became morose and cold, and shunned the society of plaintiff, refused to call on her, and compelled her, when she wanted to talk with him, to call at his place of business. He told her he could not marry her for three, four, five, six months, and finally told her he had no love for her and no respect for her, and she could go where she pleased and do what she pleased. Prior to this declaration, and soon after he returned from the hospital, he induced her to convey to him her interest in their new home they were building on the pretext that it was too far from his place of business—the home had been deeded to them when bought jointly. Thus matters continued, and went from bad to worse, until sometime about the 25th day of November, 1917, the plaintiff went to defendant's place of business and asked him to give her a definite answer one way or the other and if he had found he had made a mistake in his love for her, she would return to her home in New York and continue her work. He replied he did not care what she did, nor where she went, that he did not love her any more nor have any respect for her. She left him and went back to her brothers and the next day this suit was

brought. There is very little conflict in the testimony of the plaintiff and defendant and what little difference there is, is only in the words used, but it all meant the same thing, and that was that the defendant did not love or respect the plaintiff any more and did not care where she went nor what she did.

We have studied the testimony of all the witnesses and, as before stated, there are some minor differences in the testimony, but as a whole, it tends to support the contention of the plaintiff and sustains the verdict of the jury. We are inclined to think the court below erred in having defendant, and at least some of his witnesses, sworn with their hats on. This error, however, is not sufficient to reverse the case in view of the verdict of the jury, and we will not give it further consideration.

The plaintiff in error has assigned five specifications of error in his petition in error. The motion for a new trial was filed on the 7th day of March, 1919, but was not heard until the 6th day of September, 1919. On the 2nd day of August, the motion for a new trial came on for hearing, and after hearing the motion and the arguments thereon, counsel for defendant asked and obtained leave to amend the motion for new trial by adding an assignment of misconduct of the jury; and counsel takes this assignment up first in his argument and we will consider the various assignments in the same order that counsel for plaintiff in error has considered them, as nearly as we can. This assignment of error is based on a remark made by one of the jurors, G. W. Burroughs, on the date following the trial, when he stated in the presence of Judge Caruthers, one of the counsel for defendant, and also in the presence of a man by the name of Waggoner, that he knew that Shy Mayer was a damned crook any way, and that he was the man who stood out for $10,000. Judge Caruthers and Waggoner swore to Burroughs making this remark. The plaintiff filed a counter affidavit made by the juror Burroughs, in which he stated that he did not know Shy Mayer prior to the trial, knew nothing about him, and that he had no recollection of making the remark attributed to him by Judge Caruthers and Waggoner, but if he did make such remarks, they were based upon his impressions received from the evidence at the trial and not from any personal knowledge that he had of Shy Mayer prior to the trial.

We have examined the evidence in support of this assignment of error, which was

one of the grounds for a new trial, and we think the court properly considered this assignment along with the others set up in the motion for new trial, and that his ruling thereon was correct. We have little patience with the methods resorted to after the trial, of quizzing jurors and getting them to say something that counsel thinks will be of advantage and setting that up as a ground for a new trial. We do not know Mr. Burroughs but are inclined to take his version of the matter, and if he had added that it was said in a spirit of bombast, we think he would have told the truth about that. Courts have been very cautious in allowing jurors to impeach their verdict by anything they might say after the trial of the case, and we are inclined to the opinion that this error was properly overruled.

The second assignment of error is that the verdict of the jury is grossly excessive but no such error is assigned in the petition in error, though it might be considered under the error on overruling the motion for a new trial, but we do not feel that it is necessary to devote very much time to a discussion of this assignment. If the plaintiff in this case was entitled to recover at all, we think she was entitled to recover the amount the jury returned a verdict for. The defendant, Shy Mayer, did everything to humiliate the plaintiff and distress her that he could think of and some of those things smack very loudly of malice, as, for instance, the affidavit that he filed for continuance in which he set up that since the commencement of this suit, the plaintiff had married. We do not care what knowledge he had that such was the fact, if he afterwards found out that he had been misinformed and wanted to do the right thing, he should have stated on the trial that he was mistaken or misinformed about the matters set up in that affidavit for continuance, and that he wished to withdraw it and say that it was not true, but instead of doing that he did not offer one syllable of proof in support of it, and makes no explanation whatever to excuse himself for making it. The jury had a right to consider several things that defendant did as done with malice, and for the purpose of humiliating the plaintiff. His entire conduct, after he returned from the hospital, was very humiliating to a sensitive girl, and then his excuse for not marrying her, and that was that she wanted him to marry her to protect her brother and keep him from having to go in the army, and that he told her he would not marry any woman to protect a slacker and if that was her game,

to go to it. It is true that the plaintiff denied that this conversation occurred, yet it shows maliciousness. The plaintiff was in a strange country among strange people. Outside of her brother's family, she did not know anyone except a few acquaintances she made after coming to Okmulgee. She met the defendant, he made love to her, and she agreed to marry him. He deceived her, and under our statutes, the matter of damages is entirely in the discretion of the jury. We cannot say that the jury abused this discretion or that the verdict is excessive. On the contrary, we believe the verdict of the jury is justified by the evidence in the case. The third assignment of error, as argued in plaintiff's brief, is that the verdict is not sustained by sufficient evidence. What we have said under the other assignment applies with equal force to this assignment, and it is unnecessary to notice it further.

The fourth assignment of error, as contained in plaintiff's brief, goes to the instruction of the trial court to the jury, but counsel have not set out in their brief any instructions that they objected to. Rule 26, 47 Okla. x, says, where a party complains of instructions given or instructions refused, he shall set out in totidem verbis in his brief separately the portion to which he objects or may have saved exceptions. This rule is intended that the courts may have the exact part of instructions before it without having to search the record for it. We have, however, read the entire instructions of the court and think that they fairly presented the case to the jury and that there was no error in giving or refusing instructions.

The fifth assignment of error in the brief is that the court erred in overruling defendant's demurrer to plaintiff's petition. We have considered this assignment carefully and think it is without merit. The petition might have been a little more artistically drawn, but in our judgment, taking it all together, it states a cause of action and the demurrer was properly overruled.

The sixth assignment of error by plaintiff in his brief raises a question not raised on motion for new trial, but as it goes to the jurisdiction of the court, we will pass on it. This assignment raises the question that the court at Okmulgee was not legally in session on the 4th day of March, the date the case was tried, and calls attention to the act of the Legislature, as contained in chapter 74, Session Laws 1919, wherein the terms of the court at Okmulgee were chang-

ed so as to commence on the first Monday in February, June, and October of each year. The prior statute fixing the terms of the court in Okmulgee county fixed the time of holding court as the first Monday in March, June, and November. This act changing the time was approved February 24, 1919. The court had set its docket presumably for the regular March term under the old act. Whether the November term of the court, under the old act, had been adjourned sine die does not appear in the record and nothing has been called to our attention to show that it had adjourned. If it had not, it is sufficient to say that the court could have continued its November term up to the first Monday in June, and its proceedings would have been perfectly regular. The order convening the court on the 4th day of March, 1919, says, "this cause came on for trial according to the regular setting of the docket", etc. This would indicate that there had been a trial docket set and that this case came on in its regular order. No question was made about the court not being regularly in session until October, 1919, after the trial. Inasmuch as the question was not raised at the trial, we think it is fair to presume that neither the court nor counsel had heard of the passage and approval of the new act changing the terms of the court in that county and that court was either proceeding under the November term or proceeding without convening the March term. In either event, we think the court was legally in session. Section 3089, Comp. Stats. 1921, provides:

"Two or more courts in county and district. Two or more district judges may sit and hold court at the same time in the same county during term time; and regular terms or adjourned terms of court in two or more counties in the same judicial district shall proceed until the same are adjourned sine die."

The case of St. Louis & S. F. R. R. Co. v. James et al., 36 Okla. 196, 128 Pac. 196, is an opinion by Commissioner Brewer, and we will only quote the first and second paragraphs of the syllabus:

"1.  Courts — Terms — Effect of Adjournment.

"Where a general term of court has been once regularly convened, on the day fixed by law, it can expire only by operation of law, or by an adjournment sine die; and where court has been so regularly convened, and has been adjourned to a day further on in the term, the failure of the judge, on account of sickness, to appear and hold a session on the day to which an adjourn-

ment has been taken, does not result in the loss or lapse of the term.        ·    · ·

"2.    Same—Legality of Decision.

"A district court was regulary convened for general purposes, at the time and place fixed by order of the Supreme Court, and continued in session from the 30th of November until the 18th of December, when an adjournment was taken to the 21st of December, at which time the judge was unable, because of sickness to appear and open and hold a session of court. On the 28th of December, a day within the limits of the term of court as fixed, the judge appeared and held a session of the court, trying a case, previously assigned regularly for trial on that date. Held, that the court was legally constituted and that its proceedings and judgments are valid."

The authorities on this subject from this and other jurisdictions are ably collected and commented on and the court reached the conclusion indicated in the syllabus above quoted, and we think under that decision there is no question but what the court at Okmulgee was legally in session on the 4th day of March, 1919. After a patient review of the entire record, including the evidence at the trial and the briefs of the respective counsel, we are of the opinion that no prejudicial error has been shown and that the judgment of the trial court should be, and is in all things hereby affirmed.

On appeal to this court from a judgment in the district court of Okmulgee a supersedeas bond was filed, executed by plaintiff in error, as principal, and Max Euster, Bill Panos, John Panos, and John Schaum, as sureties, to stay execution on said judgment. Counsel for defendant in error have included in their brief a motion that upon affirmance of the judgment, a judgment be entered on the supersedeas bond, to which they are entitled under the law.

The judgment of the trial court was rendered on March 4, 1919, in the sum of $5,000, and it is provided therein that said judgment shall bear interest thereon at the rate of six per cent. Judgment, therefore, will be entered in this court against the sureties on the appeal bond. Max Euster, Bill Panos, John Panos, and John Schaum in the sum of $5,000, with interest thereon at the rate of six per cent. per annum from March 4, 1919, until paid, and for costs, for which let execution issue.

By the Court: It is so ordered.